1  **Julie Pesanti DeLong**
   **Registered Professional Reporter**
2  **PO Box 163**
   **St. Ignatius, Montana  59865**
3  **(406) 498-3941**
   **Email:  fortherecord1103@gmail.com**
4

5  _____

                  **IN THE UNITED STATES DISTRICT COURT**
6                    **FOR THE DISTRICT OF MONTANA**
                       **GREAT FALLS DIVISION**
7

   UNITED STATES OF AMERICA,          )
8                                      )
                       Plaintiff,  )
9                                      )          CR-17-69-GF-BMM
      versus                          )
10                                     )
   DENISE L. SHARP,                    )
11                                     )
                       Defendant.  )
12 _____

13                   **TRANSCRIPT OF PROCEEDINGS**

14                        **CHANGE OF PLEA**

15

              **BEFORE THE HONORABLE JOHN T. JOHNSTON**
16     **UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**
                  **FOR THE DISTRICT OF MONTANA**
17
                     Chief Mountain Courtroom
18            Missouri River Federal Courthouse
             United States District Court Great Falls
19                   125 Central Avenue West
                     Great Falls, MT 59404
20
                       **December 11, 2018**
21                        **11:21 a.m.**

22

23

24          Proceedings recorded by recording software
      Transcript produced by computer-assisted transcription
25

| | |
|---|---|
| 1 | **APPEARANCE OF COUNSEL:** |
| 2 | |
| 3 | **For the Plaintiff:** |
| 4 | Mr. Ryan G. Weldon |
| | Assistant United States Attorney |
| 5 | United States Attorney's Office - Great Falls |
| | P.O. Box 3447 |
| 6 | 119 First Avenue North, Suite 300 |
| | Great Falls, MT 59403 |
| 7 | (406) 761-7715 (Phone) |
| | (406) 453-9973 (Fax) |
| 8 | Email: Ryan.Weldon@usdoj.gov |
| 9 | |
| 10 | **For the Defendant:** |
| 11 | Mr. Paul Gallardo |
| | Flaherty Law Office |
| 12 | 1026 1st Avenue South |
| | P.O. Box 1968 |
| 13 | Great Falls, Montana  59403 |
| | (406) 727-8494 (Phone) |
| 14 | (406) 727-8537 (Fax) |
| | Email:  paul@flahertylawyers.com |
| 15 | |
| 16 | Also present: |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**PROCEEDINGS**


**(Open court)**

**(Defendant present)**

**(Proceedings began at 11:21 a.m.)**


CLERK OF COURT:  This Court will now conduct a change of plea hearing in Criminal 17-69 of the Great Falls Division, Judge Morris, United States of America versus Denise L. Sharp.

(Discussion off the record.)

MR. GALLARDO:  Your Honor, may I approach?

THE COURT:  You may.

Good morning, ma'am.

THE DEFENDANT:  Good morning.

THE COURT:  Please state your full name for the record.

THE DEFENDANT:  Denise -- Denise L. Bear Medicine Sharp.

THE COURT:  Ms. Sharp, my name is John Johnston, and I think we've met before.  I'm the United States Magistrate Judge.  Today I am here on a motion by you to change your plea from not guilty to guilty.

Is that your understanding, as well?

THE DEFENDANT:  Yes.

1          THE COURT:  I have a consent in front of me

2   that's -- there is a signature line for "Denise L. Sharp," did

3   you sign that?

4          THE DEFENDANT:  Yes.

5          THE COURT:  And then there's signatures for

6   Mr. Gallardo and Mr. Weldon, as well.  And what that means is

7   that you've consented to me presiding over your change of plea

8   hearing.

9      I will recommend acceptance of your guilty plea if I am

10  satisfied at the conclusion of the hearing that your guilty

11  plea is knowing and voluntary.

12      And is my understanding of consent correct, Mr. Weldon?

13         MR. WELDON:  That is correct, Your Honor.

14         THE COURT:  And Mr. Gallardo?

15         MR. GALLARDO:  Yes, Your Honor.

16         THE COURT:  And, Mr. Weldon, we are here on a plea

17  agreement; is that right?

18         MR. WELDON:  Your Honor, actually, in --

19         THE COURT:  Or not.

20         MR. WELDON:  -- this particular case there is no

21  plea agreement.

22         THE COURT:  There is -- okay.

23         MR. WELDON:  Yes.

24         THE COURT:  All right.  Is there a victim that has a

25  right to be heard?

1    MR. WELDON:  There is, Your Honor.  They have been

2    notified, but they do not wish to appear.

3    THE COURT:  All right.  And, Mr. Gallardo, would you

4    and Ms. Sharp please come forward to the podium?

5    MR. GALLARDO:  Yes, Your Honor.

6    THE COURT:  Ms. Sharp, would you please raise your

7    right hand and take the oath to tell the truth?

8

9    (The defendant was duly sworn.)

10

11    THE DEFENDANT:  Yes.

12    THE COURT:  Ms. Sharp, it's important to keep in

13    mind that you are now under oath to the tell the truth; and if

14    you say something to me during the course of the proceeding

15    that is either false or misleading, you could be subject to

16    further prosecution for perjury or making a false statement.

17    Do you understand that?

18    THE DEFENDANT:  Yes.

19    THE COURT:  This hearing will probably last between

20    30 and 40 minutes; if you need to talk to your attorney at any

21    point in time during the proceeding, please let me know and

22    we'll take an appropriate break and allow you to consult with

23    Mr. Gallardo.

24    Do you understand that?

25    THE DEFENDANT:  Yes.

1    THE COURT:  And if there is some other reasonable

2    reason that you need to take a break during the 30 to 40

3    minutes, let me know, and, if it's a reasonable reason, we'll

4    take another break for that, as well.

5        Do you understand that, ma'am?

6            THE DEFENDANT:  Yes.

7            THE COURT:  Before I can accept your plea of guilty,

8    I must be satisfied that your plea is voluntary, and that you

9    fully understand the procedure.  I must be convinced that you

10   understand the following:  The charges against you, the

11   consequences of pleading guilty, the maximum potential

12   penalties that you face, and the rights that you would be

13   waiving by pleading guilty.

14     I must also satisfy myself that the government could

15   prove that you are, in fact, guilty of the charges to which

16   you intend to plead guilty, because we don't want people

17   pleading guilty to charges that couldn't be proven against

18   them.

19       Do you understand all of that?

20           THE DEFENDANT:  Yes.

21           THE COURT:  How old are you, ma'am?

22           THE DEFENDANT:  60.

23           THE COURT:  Are you married?

24           THE DEFENDANT:  Yes.

25           THE COURT:  And who is your husband?

```
 1                    THE DEFENDANT:  Willy Sharp.

 2                    THE COURT:  And how long have you folks been

 3    married?

 4                    THE DEFENDANT:  (Pause)  40 years.

 5                    THE COURT:  Wow.  And do you two have any children?

 6                    THE DEFENDANT:  Uhm, three.

 7                    THE COURT:  And how old are your children?

 8                    THE DEFENDANT:  Uhm, 40, 24, and, I think -- let's

 9    see, 32, and 24.

10                    THE COURT:  Okay.

11                    THE DEFENDANT:  And then I have three grandchildren

12    I'm raising.

13                    THE COURT:  That you're raising.  They live with

14    you?

15                    THE DEFENDANT:  Yes.

16                    THE COURT:  And how old are your grandchildren?

17                    THE DEFENDANT:  19, 12, and 7.

18                    THE COURT:  What is your highest level of formal

19    education?

20                    THE DEFENDANT:  A senior at, uhm, university -- at

21    the University.

22                    THE COURT:  Okay.  Did you -- did you not finish

23    your degree?

24                    THE DEFENDANT:  Ran out of funding.

25                    THE COURT:  Okay.  And what years were you at the
```

1   University of Montana?

2          THE DEFENDANT:  Uhm, offhand, I can't give you any

3   years.

4          THE COURT:  Okay.

5          THE DEFENDANT:  But I fluctuated between Blackfeet

6   Community College, uhm, Montana State, and the University of

7   Montana.

8          THE COURT:  Okay.  I transferred a few times,

9   myself.

10          THE DEFENDANT:  (Chuckles)

11          THE COURT:  Tell me about your employment history.

12   Just since you've been an adult.

13          THE DEFENDANT:  I -- I started working at the

14   Headstart program as a volunteer in 1980, and then I got hired

15   as a co-teacher in '83.  Went to Browning public school in

16   1985, and worked there for about seven years.  And then took

17   time off and went to, uhm, college at Blackfeet Community

18   College, and went back in 1996 as a radio operator.  But in

19   between that and my main source of employment as fire

20   fighting.  And, uhm, I am not able do that anymore due to I

21   broke my leg.  I'm handicapped, too.

22          THE COURT:  Okay.  Have you ever been treated for

23   any kind of mental illness or mental disease?

24          THE DEFENDANT:  No.

25          THE COURT:  Have you ever been treated for drug or

1    alcohol abuse?

2              THE DEFENDANT:  No.

3              THE COURT:  Are you currently under the influence of

4    alcohol or any kind of drug?

5              THE DEFENDANT:  No.

6              THE COURT:  Are you currently under the care of a

7    doctor or a physician?

8              THE DEFENDANT:  Uhm, currently not, but, uhm, with

9    my disability I routinely have to go, you know, see the doctor

10   every six months or so.

11             THE COURT:  And what kind disability do you have?

12             THE DEFENDANT:  Uhm, a broken leg.  It's handi- --

13   I'm handicapped.

14             THE COURT:  Because of the nature of the break.

15             THE DEFENDANT:  Uh-huh.  Yes.

16             THE COURT:  Which leg?

17             THE DEFENDANT:  The right.

18             THE COURT:  And did you break that firefighting?

19             THE DEFENDANT:  Uh, hunting.

20             THE COURT:  Hunting.

21             THE DEFENDANT:  I wasn't really hunting, I was a

22   scout.

23             THE COURT:  Okay.  All right.  Are you currently

24   taking any sort of medication, either prescription or

25   over-the-counter?

1      THE DEFENDANT:  Uh, yes.  I'm taking Metformin,

2  aspirin, Lisinopril.

3      THE COURT:  So Metformin is for diabetes.

4      THE DEFENDANT:  Diabetes, yeah.

5      THE COURT:  And the aspirin, you take that just for

6  pain, or do you take it for --

7      THE DEFENDANT:  No, for, uhm -- according to the

8  doctors, it's just to protect your kidneys.

9      THE COURT:  Okay.  And Lisinopril?

10      THE DEFENDANT:  For, uhm -- to protect your kidneys,

11  too.  But, uhm, I don't have high blood pressure.  But that's

12  a high blood pressure medicine.

13      THE COURT:  Right.  That's what I thought.  Okay.

14  Is there anything about any of those drugs, either

15  individually or in combination, that makes it difficult for

16  you to understand what we are --

17      THE DEFENDANT:  No.

18      THE COURT:  -- doing here today?

19      THE DEFENDANT:  No.

20      THE COURT:  All right.  Do you have a copy of the

21  Indictment with you today, ma'am?

22      THE DEFENDANT:  Uhm, no, I don't, but, uhm, my

23  husband does.

24      THE COURT:  Your man does.  Your man's got it for

25  you.  Have you -- you've seen the Superseding Indictment; is

1    that right?

2              THE DEFENDANT:  Yes, I did.  Yes, I did.

3              THE COURT:  And you read it?

4              THE DEFENDANT:  Yes, I did.

5              THE COURT:  And you discussed it with Mr. Gallardo?

6              THE DEFENDANT:  Yes, I did.

7              THE COURT:  And do you understand the charges

8    against you in the Superseding Indictment?

9              THE DEFENDANT:  Yes, I do.

10             THE COURT:  Okay.  Just to make sure that we are on

11   the same page, in Count I of the Superseding Indictment you're

12   accused of committing the crime of theft from an Indian tribal

13   government receiving federal funding, in violation of Title

14   18, United States Code Section 666(a)(1)(A) and (2), and in

15   Count II you're accused of committing the crime of wire fraud,

16   in violation of Title 18, United States Code Sections 1343 and

17   2.

18       Is that your understanding of the crimes that you've been

19   charged with?

20             THE DEFENDANT:  Uhm, yes.

21             THE COURT:  There's also a forfeiture allegation in

22   which the government alleges that if you are convicted of

23   Count I or Count II, then you should be required to forfeit,

24   that means give to the government, $38,711.

25       Is that your understanding of the forfeiture allegation,

```
1    as well?

2              THE DEFENDANT:  Yes.

3              THE COURT:  All right.  You previously pled not

4    guilty to Counts I and II, and you denied the forfeiture

5    allegation.  You have the right to continue with your not

6    guilty plea and denial to the forfeiture allegation if you

7    wish.

8         Do you understand that?

9              THE DEFENDANT:  Yes.

10             THE COURT:  And we do not have a plea agreement; is

11   that correct?

12             MR. WELDON:  That's correct, Your Honor.

13             THE COURT:  All right.  In relation to Count I,

14   ma'am, if you are convicted of Count I, which is the theft

15   from an Indian -- and you are going to be convicted of it

16   because you are going to plead guilty, if your guilty plea is

17   accepted in relation to Count I, which is theft from an Indian

18   tribal government receiving federal funding, the maximum

19   penalties you are facing are 10 years of imprisonment, a

20   $250,000 fine, and three years of supervised release.  The

21   Court would also be required to impose a $100 special

22   assessment.

23        In relation to Count II, by pleading guilty to that

24   count, which is wire fraud, in violation of Title 18, United

25   States Code Sections 1343 and 2, the maximum penalties that
```

1    you are exposed to are 20 years of imprisonment, a $250,000

2    fine, three years of supervised release, and another $100

3    special assessment.

4        Do you understand the maximum potential punishment that

5    you are facing in relation to Count I and Count II?

6                THE DEFENDANT:  Yes.

7                THE COURT:  Your attorney is Mr. Gallardo; is that

8    correct?

9                THE DEFENDANT:  Yes.

10               THE COURT:  Have you discussed the government's case

11   against you with Mr. Gallardo?

12               THE DEFENDANT:  Yes.

13               THE COURT:  Did you discuss the facts of the case

14   with Mr. Gallardo?

15               THE DEFENDANT:  Yes.

16               THE COURT:  Did you discuss with him the charges in

17   the Indictment against you, the Superseding Indictment?

18               THE DEFENDANT:  Yes.

19               THE COURT:  Did you discuss with Mr. Gallardo

20   whether you had any potential defenses to the charges against

21   you in the Superseding Indictment?

22               THE DEFENDANT:  Yes.

23               THE COURT:  Did Mr. Gallardo investigate the case to

24   your satisfaction?

25               THE DEFENDANT:  Yes.

1        THE COURT:  Are you completely and totally satisfied

2   with Mr. Gallardo's representation of your interests?

3        THE DEFENDANT:  Yes.

4        THE COURT:  Has he answered any questions that you

5   had about pleading guilty?

6        THE DEFENDANT:  Yes.

7        THE COURT:  It's important to keep in mind that you

8   are entitled to a trial if you maintain your not guilty plea.

9   And if you want a trial, you are going to get a trial.  And

10  you have the right to a jury trial, or you could waive that

11  right and have the court, that's Judge Morris, decide whether

12  you committed the crimes alleged in the Superseding

13  Indictment.

14      If you requested a jury trial, the jury would be

15  comprised of 12 people randomly selected from a jury pool of

16  registered voters and licensed drivers that reside in the

17  Great Falls Division of the United States District Court for

18  the District of Montana.

19      At trial, you would have certain rights.  You would have

20  the right to be represented by Mr. Gallardo at no cost to you,

21  you would have the right to confront and cross examine all the

22  witnesses that the government called to testify against you.

23  You would have the right to call witnesses to testify on your

24  behalf, and, if necessary, the court would compel witnesses to

25  testify.

1    You would have the right to testify at trial, and you

2  would also have the right to remain silent and not testify at

3  trial.  If you choose to exercise your right to remain silent,

4  Judge Morris would instruct the jury that your silence is not

5  evidence of guilt or innocence.

6    At trial, the jury would be instructed by the court as

7  follows:  That you are presumed to be innocent.  That the

8  charges against you must be proven beyond a reasonable doubt.

9  That the burden to prove you guilty rests entirely with the

10  government, and that any verdict must be unanimous.

11    If you were convicted following trial, you would have the

12  right to appeal your conviction to the United States Court of

13  Appeals for the Ninth Circuit.  If the Court of Appeals

14  concluded that the court made a legal error, or that you did

15  not receive a fair trial, it could set your convictions aside.

16    Now, if you plead guilty, and I accept your guilty pleas,

17  there will be no trial, and you will have waived all of the

18  rights that I just discussed.  Knowing all of this, do you

19  still wish to waive these rights and plead guilty, or do you

20  want to go to trial?

21    THE DEFENDANT:  Uhm -- uhm, I don't want to go to

22  trial.

23    THE COURT:  Well, the only way you can avoid going

24  to trial is by pleading guilty.

25    THE DEFENDANT:  Oh, yeah, plead guilty.

1        THE COURT:  Okay.  You should also know that by

2   pleading guilty you would also likely lose certain civil

3   rights, like the right to vote, the right to hold public

4   office, the right to serve on a jury or a grand jury, and the

5   right to possess firearms, which would be a lifetime ban.

6        Do you understand all of that?

7        THE DEFENDANT:  Yes.

8        THE COURT:  If the court were to sentence you to a

9   term of custody or imprisonment, there is no possibility that

10  you would be released early on parole.  That's because parole

11  does not exist in the federal criminal justice system.  If you

12  are sentenced to a term of imprisonment, you will have to

13  serve that entire prison term.

14       Do you understand that?

15       THE DEFENDANT:  Yes.

16       THE COURT:  Now, supervised release means that when

17  you are released from prison, you would be under the

18  supervision of the United States Probation Office, and you

19  must comply with certain conditions of release set by the

20  court.  If you violate any of the conditions, the court could

21  revoke your supervised release and send you back to prison.

22       Do you understand what supervised release is?

23       THE DEFENDANT:  Yes.

24       THE COURT:  And has anybody forced you to plead

25  guilty?

1           THE DEFENDANT:  No.

2           THE COURT:  Has anybody threatened you or anyone

3    that you care about in any way to get you to plead guilty?

4           THE DEFENDANT:  No.

5           THE COURT:  Are you pleading guilty to cover up

6    somebody else's criminal activity or wrongdoing?

7           THE DEFENDANT:  No.

8           THE COURT:  Has anyone promised you anything if you

9    plead guilty?

10          THE DEFENDANT:  No.

11          THE COURT:  Have you ever been convicted of a

12   felony?

13          THE DEFENDANT:  No.

14          THE COURT:  I want to make sure you understand how

15   the sentencing process will work if you plead guilty and your

16   guilty plea is accepted.

17       First, the Probation Office will prepare a Presentence

18   Report for Judge Morris, and it will calculate a recommended

19   sentence range.  The sentence range calculation is a four-step

20   process.

21       First, your based offense level is determine.  Next, your

22   base offense level is adjusted up or down based upon certain

23   factors to produce your adjusted offense level.  For example,

24   if you accept responsibility for a crime, the base offense

25   level is adjusted down.

1    After that, your criminal history category is determined.

2    To do that, the Probation Office looks at your encounters with

3    law enforcement.  Each encounter is assigned a score, like

4    zero points, one point, two points, three points.  Your

5    criminal history points are totaled up, and that is your

6    criminal history category.

7    And the final step of the process is the sentencing

8    chart.  All of those things are done to arrive at a -- some

9    criteria that the sentencing chart can be used.  So, let's

10   just assume that your adjusted offense level is a -- and I

11   have no idea what it's going to be.  I'm just -- I have no

12   idea.  I'm just doing this for an example.

13   Let's assume that it's an adjusted offense level of 12

14   and your criminal history category is I -- that's the lowest

15   it could be -- then you go down to the 12 and over to the I,

16   and then the sentencing guideline would say that your sentence

17   should be 10 to 16 months of custody.

18   Have you ever seen this sentencing chart?

19                THE DEFENDANT:  Yes, I did.

20                THE COURT:  Okay.  Is that your understanding of

21   about how it works, as well?

22                THE DEFENDANT:  Yes.

23                THE COURT:  All right.  And once that range is

24   calculated, the court must then consider factors set forth in

25   18 United States Code Section 3553(a).   These factors include

1  your history and characteristics, the nature and circumstances

2  of the offense, the need for just punishment, and the need to

3  promote a respect for the law.

4      The final step in the sentencing process is a sentencing

5  hearing.  Judge Morris will conduct your sentencing hearing in

6  the courtroom next door, and he will be the person who imposes

7  your sentence.

8      At the sentencing hearing, you, your attorney, and the

9  Assistant United States Attorney will be given an opportunity

10  to speak to and recommend an appropriate sentence to Judge

11  Morris.

12      After he takes what each person has into due

13  consideration, Judge Morris will determine and impose upon you

14  a sentence that is sufficient but not greater than necessary.

15      Do you understand the sentencing process?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Mr. Weldon, please describe the elements

18  that the government would be required to prove before

19  Ms. Sharp could be found guilty of Counts I and II.

20          MR. WELDON:  Yes, Your Honor.

21      In this case, for Count I, the theft from an Indian

22  tribal government receiving federal funding, there are five

23  elements:

24      First, the defendant was an agent of Indian tribal

25  government or an agency thereof;

1    Second, the Headstart program received in excess of

2    $10,000 during any one-year period under a federal grant,

3    contract, subsidy, loan, guarantee, insurance, or other form

4    of federal assistance;

5    Third, the defendant embezzled, stole, obtained by fraud,

6    or otherwise, or knowingly converted to the use of any person

7    other than the rightful owner or intentionally misapplied

8    property;

9    Fourth, the property had a value of $5,000 or more; and,

10   Fifth, the defendant was -- the property was owned by or

11   was under the care, custody, or control of the Headstart

12   program.

13   For Count II, Your Honor, for wire fraud, there are four

14   elements:

15   First, the defendant knowingly participated in, devised,

16   and intended to devise, a scheme or plan to defraud, or a

17   scheme or plan for obtaining money or property by means of

18   false or fraudulent pretenses, representations, or promises;

19   Second, the statements made or facts omitted as part of

20   the scheme were material; that is, they had a natural tendency

21   to influence or were capable of influencing a person to part

22   with money or property;

23   Third, the defendant acted with the intent to defraud;

24   that is, the intent to deceive or cheat; and,

25   Fourth, the defendant used or caused to be used a wire

1  communication to carry out or attempt to carry out an

2  essential part of the scheme.

3          THE COURT:  Thank you, Mr. Weldon.

4      And, Mr. Gallardo, was that an accurate statement of the

5  legal elements for Counts I and II?

6          MR. GALLARDO:  Yes, it was, Your Honor.

7          THE COURT:  Mr. Weldon, please describe the proof

8  the government would present at trial with respect to Counts I

9  and II.

10          MR. WELDON:  Yes, Your Honor.  If this case

11  proceeded to trial, the United States would prove that the

12  Headstart program was designed to help break the cycle of

13  poverty, providing preschool children of low income families

14  with a comprehensive program to meet their emotional, social,

15  health, nutritional, and psychological needs.

16      Headstart and Early Headstart programs provide services

17  to over a million children every year in every U.S. state and

18  territory, in farm worker camps, and in over 155 tribal

19  communities.

20      Headstart is overseen by the United States Department of

21  Health and Human Services Office of Administration for

22  Children and Family Services, and provides comprehensive early

23  childhood education, health, nutrition, and parent involvement

24  services to low income children and their families.

25      The program services and resources are designed to foster

1    stable family relationships, enhance childrens' physical and

2    emotional well-being, and establish an environment to help

3    strong cognitive skills.

4        Headstart is one of the longest running programs

5    attempting to decrease systemic poverty in the United States

6    by intervening to aid children.  Those who participate in the

7    Headstart program receive grants from the United States

8    Department of Health and Human Services, which is a federal

9    agency, and provides federal funds.

10       On or about April 23rd, 2012, the Blackfeet Tribe of the

11   Blackfeet Nation submitted an application for a continuation

12   grant from HHS for its Headstart program.  The application

13   called for funding from HHS for the period starting from

14   August 1st of 2012, through July 31st of 2013.

15       On or about August 7th, 2012, the Administration for

16   Children and Family Services awarded the Blackfeet Headstart

17   program 3.6 million in federal funds for the period from

18   August 1st, 2012, through July 31st of 2013.

19       On or about May 6th, 2013, the Blackfeet Tribe of the

20   Blackfeet Nation submitted an application for a continuation

21   grant from HHS for its Headstart program.  The application

22   requested funding from HHS for the period starting from August

23   1st of 2013, through July 31st of 2014.

24       On or about August 2nd, 2013, the Administration for

25   Children and Family Services awarded the Blackfeet Headstart

1   program 3.4 million in federal funds for the period from

2   August 1st of 2013, through July 31st of 2014.

3        In this case, then we have the overtime scheme, Your

4   Honor, Ms. Sharp was the personnel manager for the Headstart

5   program.  Ms. Sharp and others fraudulently claimed and

6   received payment for overtime at the Headstart program.  All

7   total, the individuals claimed over 7,800 hours of overtime

8   and received over 232,000 in federal funds from the Headstart

9   program in a 15-month time frame.

10       When the fraud was uncovered, the Blackfeet Headstart

11  program was audited by two different firms.  Both audits

12  questioned the overtime claims, identifying the claims as,

13  "beyond necessary and reasonable" and lacking any supporting

14  documentation.

15       The Blackfeet Tribe agreed through its own internal

16  review that it could not justify the overtime claims made by

17  Blackfeet Headstart program personnel.  As a result, the

18  Blackfeet Tribe repaid HHS $250,620.29 to satisfy the agency

19  findings for disallowed costs associated with the Blackfeet

20  Headstart program, overtime claims, and other expenses.

21       During the subsequent criminal investigation, authorities

22  interviewed various individuals.  One individual explained

23  that an on-site internal review of the Blackfeet Headstart

24  program took place by government authorities from Washington,

25  D.C.

1    After the review, Theresa Calf Boss Ribs, Patrick Calf

2  Boss Ribs Grant, Denise Sharp, Carol Bird, and others, met in

3  a conference room.  Despite not actually working the hours,

4  everyone present in the room agreed to continue claiming

5  overtime.

6    Other workers at the Blackfeet Headstart program never

7  saw Blackfeet Headstart personnel working late nights or on

8  weekends.  One employee stated, "There was nobody around."

9    The chairman of the board for the Blackfeet Headstart

10  program also identified that budget cuts were necessary during

11  the relevant time frame.  The chairman of the board was

12  completely unaware of the exorbitant overtime claims, nor was

13  he aware of any needs that would have justified the overtime

14  claims made by Ms. Calf Boss Ribs, Ms. Sharp, and others.

15    All of Ms. Sharp's check deposits, and those of others in

16  the Headstart program, created wires, which traveled from

17  Montana to and from Minneapolis, Minnesota, through the

18  Federal Reserve system, and back to Montana, again.

19    All total, Ms. Sharp received $38,711 in overtime claims

20  from the Headstart program.

21    If this case proceeded to trial, Your Honor, that would

22  be the evidence the United States would offer.

23    THE COURT:  Thank you very much, Mr. Weldon.

24    And, Ms. Sharp, do you understand what the government

25  says it would prove if your case went to trial?

1    THE DEFENDANT:  Yes.

2    THE COURT:  Do you disagree with anything that

3    Mr. Weldon just stated in open court about what the government

4    would prove if your case went to trial?

5    THE DEFENDANT:  Yes, I do.

6    THE COURT:  What do you disagree with?

7    THE DEFENDANT:  I disagree -- I disagree with the --

8    a meeting that, uhm, was brought forward, you know, that we

9    sat and discussed doing the overtime.

10    THE COURT:  Anything else?

11    THE DEFENDANT:  I disagree with the chairman of the

12    board.  He was full well-aware that a cer- -- that managers --

13    and not only managers, but teachers and custodians were given

14    that opportunity to do overtime based on the -- the review

15    that was going to take place.

16    And, uhm, I don't know, there is so much, uhm, things

17    that go on in tribal programs, but, on my computer, uhm, the

18    chairman of the board did see -- he did have a letter, and he

19    knew full-well that there was overtime.  And he agreed to it,

20    along with the other policy council board members.

21    And I dispute the 38,000, because, uhm, I always work

22    overtime.  Whether I'm credited for it or not credited.

23    MR. GALLARDO:  And, just for the record, Your Honor,

24    we are not -- we are going to plead -- plead guilty to these.

25    There was an amount, uhm -- amount of overtime claimed that

1  was -- that was not earned.  It's the -- that total figured,

2  38,711, that, we are ultimately disputing and will resolve

3  later on in a forfeiture hearing, along with two other

4  co-defendants.

5          THE COURT:  All right.  Well, Mr. Weldon read off

6  quite a series of facts there that he says the government

7  would prove.

8          THE DEFENDANT:  Yes.

9          THE COURT:  The essence of part of it is, is that

10  you claimed entitlement to payment for overtime when you did

11  not work overtime.  Is that true, or not?  To an extent is it

12  true?

13          THE DEFENDANT:  To an extent.

14          THE COURT:  Okay.  You're disputing the extent, but

15  not the fact that you -- you submitted claims for overtime

16  compensation and payment, when, in fact, you had not worked

17  some of those overtime hours; is that right?

18          THE DEFENDANT:  That's right.

19          THE COURT:  And, then -- so you agree with that.

20          THE DEFENDANT:  Yes.

21          THE COURT:  Okay.  And you, then, deposited certain

22  checks to you from the Headstart program into accounts, and

23  then they had to -- those checks had to travel by wire from

24  Montana to Minneapolis, Minnesota, and back through the

25  Federal Reserve system.

```
 1          Do you agree with that?
 2               THE DEFENDANT:  (Pause)  Could I consult with my
 3    lawyer?
 4               THE COURT:  Consult with him, please.
 5                         (White noise.)
 6                    (Discussion off the record.)
 7               MR. GALLARDO:  Your Honor, I think we may have to
 8    have a five- to ten-minute recess, just -- may we have a five-
 9    to ten-minute recess so we can consult with Mr. Weldon and
10    iron out some things?
11               THE COURT:  We will take a recess until noon.
12               MR. GALLARDO:  Thank you, Your Honor.
13               THE COURT:  Court's in recess.
14                         (Recess taken.)
15               MR. GALLARDO:  We appreciate the break.  There was
16    just something that we needed to sort out.  And, perhaps,
17    Ms. Sharp can address it.
18               But, basically, Ms. Sharp cashed the -- most of her
19    checks and didn't -- didn't actually keep them in the bank.
20    Uhm, but we acknowledge there was still wires created by her
21    receiving the cash from her checks.
22          And Mr. Weldon can touch on that.
23               MR. WELDON:  Your Honor, if I could just help the
24    Court briefly.  I think the word that was triggering some
25    concern was "deposits."
```

1          THE COURT:  Oh, okay.

2          MR. WELDON:  And, so, from our perspective, the

3   government's perspective, whether it was a deposit or a

4   cashing, that would still generate the wire communication that

5   goes through the Federal Reserve, and returns, which would

6   still trigger the wire fraud statute.

7          THE COURT:  Right.  So, if Ms. Sharp got a check

8   from Headstart, took it to wherever and cashed it, in that

9   institution there would be wires related to receiving that

10  check --

11         MR. WELDON:  That --

12         THE COURT:  -- and them giving her money.

13         MR. WELDON:  That is correct, Your Honor.

14         THE COURT:  All right.

15     All right.  So, with that in mind, ma'am, do you agree

16  that there were wires generated as a result of you receiving

17  overtime compensation, when, in fact, certain overtime work

18  was not performed?

19         THE DEFENDANT:  Uhm, yes.

20         THE COURT:  All right.

21     And, Mr. Gallardo, do you believe the Offer of Proof is

22  inaccurate or wrong in any way, other than the ways set forth

23  by your client?

24         MR. GALLARDO:  Uhm, no, Your Honor.  The -- I guess,

25  the only other thing that I would add is that on Page -- about

1    the middle of Page 7 it says, "Other -- other workers at the

2    Blackfeet Headstart program never saw Blackfeet Headstart

3    personnel working late nights or on weekends," and one

4    employee stated, "There was nobody around," those are -- those

5    are accurate statements, but discovery, I believe, showed that

6    there was at least one or two people who said that they saw a

7    car there on a late night or on some weekend.  So, I just

8    wanted to add that in.  But it -- it is a true statement, that

9    many said that there were no -- nobody working there late

10   nights and weekends.

11           THE COURT:  And, then, in relation just to the --

12   whether the -- whether or not there was a meeting after the

13   review wouldn't affect whether or not Ms. Sharp was guilty of

14   Count I or II, right?

15           MR. WELDON:  That's correct, Your Honor.

16           THE COURT:  And whether or not the chairman of the

17   board was completely unaware of the exorbitant overtime

18   claims, that wouldn't affect guilt in Count I or II, either,

19   right?

20           MR. WELDON:  It would not, Your Honor.

21           THE COURT:  Okay.  All right.

22        So, ma'am, in relation to the theft from an Indian tribal

23   government and for a government receiving federal funding,

24   you, in fact, are pleading -- you want to plead guilty to

25   theft from an Indian tribal government receiving federal

1  funding; is that right?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Okay.  And you want to plead guilty to

4  that because you were an agent of the Indian tribal government

5  through your position at the Headstart; is that right?

6          THE DEFENDANT:  Yes.

7          THE COURT:  And you agree that the Headstart program

8  receives in excess of 10,000 during any one year under a

9  federal grant, contract, subsidy, loan, guarantee, insurance,

10  or other form of federal assistance; is that right?

11          THE DEFENDANT:  Yes.

12          THE COURT:  And you embezzled, stole, obtained by

13  fraud, or otherwise, or knowingly converted to the use of any

14  person other than the rightful owner or intentionally

15  misapplied property; is that right?

16          THE DEFENDANT:  Yes.

17          THE COURT:  And the property had a value in excess

18  of $5,000 or more, correct?

19          THE DEFENDANT:  Yes.

20          THE COURT:  And the property was owned by or under

21  the care, custody, or control of the Headstart program; is

22  that right?

23          THE DEFENDANT:  Yes.

24          THE COURT:  All right.  And, then, in relation to

25  the wire fraud, you want to plead guilty to that, as well; is

1  that right?

2          THE DEFENDANT:  Yes.

3          THE COURT:  And is that because you knowingly

4  participated in, devised, or intended to devise a scheme or

5  plan to defraud or a scheme or plan for obtaining money or

6  property by means of false or fraudulent pretenses,

7  representations, or promises; is that right?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And, second, the statements made or

10  facts omitted as part of the scheme were material; that is,

11  they had a natural tendency to influence or were capable of

12  influencing a person to pay part -- or to part with money or

13  property; is that right?

14          THE DEFENDANT:  Yes.

15          THE COURT:  And, third, you acted with the intent to

16  defraud; that is, to deceive or cheat; is that correct?

17          THE DEFENDANT:  Yes.

18          THE COURT:  And, finally, you de -- you used or

19  caused to be used a wire communication to carry out or attempt

20  to carry out an essential part of the scheme; is that right?

21          THE DEFENDANT:  Yes.

22          THE COURT:  And you did that by cashing the checks,

23  correct?

24          THE DEFENDANT:  Yes.

25          THE COURT:  All right.  Then based upon our

1   discussions here today, I am going to grant your motion to

2   withdraw your previously entered plea of not guilty with

3   respect to Counts I and II, as charged in the Superseding

4   Indictment, and I asked you now, Ms. Denise L. Sharp, how do

5   you plead to Counts I and II, as set forth in the Superseding

6   Indictment?

7          THE DEFENDANT:  Uhm, guilty.

8          THE COURT:  After examining Denise L. Sharp under

9   oath, I make the following determinations:

10      Number one, Ms. Sharp is fully competent and capable of

11   entering an informed and voluntary plea to the criminal counts

12   charged against her, and an informed and voluntary -- you are

13   not admitting to the forfeiture, right?

14          MR. GALLARDO:  Correct, we are not admitting to

15   it.

16          THE COURT:  Two, that Ms. Sharp is aware of the

17   nature of the charges against her, and the consequences of

18   pleading guilty to the charges in Counts I and II.

19      Number three, that Ms. Sharp fully understands her

20   constitutional rights, and the extent to which she is waiving

21   those rights by pleading guilty.

22      And, four, the plea of guilty to the criminal counts

23   charged against her are knowing and voluntarily entered, and

24   are both supported by an independent factual grounds

25   sufficient to prove each of the essential elements of the

1   criminal counts charged in Counts I and II.

2       Therefore, I will recommend that the defendant be

3   adjudged guilty of Counts I and II of the Superseding

4   Indictment and that sentence be imposed.

5       A Presentence Investigation Report has been ordered.

6   And --

7           MR. WELDON:  Your Honor, if I may, just for the

8   Court's reference?

9           THE COURT:  Sure.

10          MR. WELDON:  Since we are dealing with the

11  forfeiture allegation, and there is not going to be a plea of

12  true to that today, we would need the defendant to waive the

13  right to a jury trial, and then have that addressed at

14  sentencing by the District Court.

15          THE COURT:  All right.  Well, thank you very much.

16      And, ma'am, do you waive your right to -- waive your

17  right to a jury trial?

18          THE DEFENDANT:  Yes.

19          THE COURT:  And you agree that the issue of the

20  amount of forfeiture will be --

21      Handled at sentencing, Mr. Weldon?

22          MR. WELDON:  That's correct, Your Honor.

23          THE COURT:  The issue of what amount of forfeiture,

24  if any, that will be determined at your sentencing hearing.

25      Do you understand that, as well?

1    THE DEFENDANT:  Yes.

2    THE COURT:  And you consent to that, as well?

3    THE DEFENDANT:  Yes.

4    THE COURT:  Anything further, Mr. Weldon?

5    MR. WELDON:  No, Your Honor.  Thank you.

6    THE COURT:  Thank you very much.

7    And, then, Ms. Sharp, you and Mr. Gallardo can take a

8    seat now.

9    The next thing that will happen in the process is that a

10    probation officer from the United States Probation Office will

11    interview you.  You should be honest and truthful when you

12    talk to the probation officer.  If you're not, that could make

13    your sentence worse.

14    You have the absolute right to have Mr. Gallardo present

15    during the interview.  After the interview, the probation

16    officer will prepare a Presentence Investigation Report.  You

17    and Mr. Gallardo will receive a copy of the report, and you

18    will have an opportunity to comment on the report.

19    When the report is in its final form, the probation

20    office will provide a copy to Judge Morris for his review.

21    You will then have the sentencing hearing that we discussed

22    earlier, and, at that point in time, the forfeiture amount

23    will be resolved at that hearing by Judge Morris.

24    And he will also impose your sentence, and you will have

25    an opportunity to address Judge Morris about what you believe

1    an appropriate sentence would be for you.

2          Do you understand that, ma'am?

3                THE DEFENDANT:  Yes.

4                THE COURT:  Your sentencing has been set for March

5    20th, 2018, at 1:30 in the afternoon.

6          And, Mr. Weldon, it looks like Ms. Sharp is not in

7    custody; is that correct?

8                MR. WELDON:  That's correct, Your Honor.  The United

9    States is not moving for detention.

10               THE COURT:  All right.  So, ma'am, you are going to

11   be -- remain free, and your requirements are -- is to be a

12   law-abiding citizen during the pendency of this proceeding.

13         Do you understand that, ma'am?

14               THE DEFENDANT:  Yes.

15               THE COURT:  Do you have any questions?

16               THE DEFENDANT:  No.

17               THE COURT:  Thank you for coming in today.

18         Mr. Gallardo, anything further from the defense?

19               MR. GALLARDO:  No, Your Honor.  Thank you.

20               THE COURT:  Mr. Weldon, anything further from the

21   government?

22               MR. WELDON:  No, Your Honor.  Thank you for your

23   time.

24               THE COURT:  And thank you, everybody here.

25         Good luck, ma'am.

1          Court's in recess.

2                    (Proceedings concluded at 12:09 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

    I, Julie L. DeLong, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my knowledge, skill, and ability.


  /s/ Julie L. DeLong          6/21/2019
Julie L. DeLong              Date